THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

**CLAUDIA SCHORRIG, URSULA KUZENKO, and JOLENE SULLIVAN** on their own behalves and behalf of those similarly situated,

    **Plaintiff,**

vs.

**IBM SOUTHEAST EMPLOYEES' FEDERAL CREDIT UNION,**

    **Defendant.**

_____/

CASE NO.: 09-80973

CLASS ACTION
JURY TRIAL DEMANDED

## AMENDED CLASS ACTION COMPLAINT

NOW COMES Plaintiffs and putative class representatives, Claudia Schorrig ("Claudia"), Ursula Kuzenko ("Ursula"), and Jolene Sullivan ("Jolene"), who bring claims on their own behalves and on behalf of those similarly situated (the "Class") against Defendant IBM Southeast Employees' Federal Credit Union ("Credit Union" or "Defendant") for Defendant's negligence, specifically: (1) its negligent failure to conduct adequate due diligence as to Wellstone Securities, LLC ("Wellstone") – a now-defunct broker-dealer that was established by fraudsters for the purpose of using the good name of God to sell bogus investments to unwitting purchasers – before it provided Wellstone with unique access to Plaintiffs and all Class members; and (2) its negligent failure to disclose that Wellstone was, in essence, a bucket-shop rife with fraud, before it decided to endorse Wellstone and actually recommend that Plaintiffs and the Class do business with Wellstone – acts of negligence that ultimately caused Plaintiffs and the Class to

1

suffer millions of dollars in losses. In support of their claims, Plaintiffs and the putative Class allege as follows:

## PARTIES

1. At all times relevant to this lawsuit, Plaintiff and putative class representative Claudia Schorrig lived in Boca Raton, Florida. She continues to do so today. At all times material to this litigation, Claudia was a Credit Union member.

2. At all times relevant to this lawsuit, Plaintiff and putative class representative Ursula Kuzenko lived in Boca Raton, Florida. She continues to do so today. At all times material to this litigation, Ursula was a Credit Union member.

3. At all times relevant to this lawsuit, Plaintiff and putative class representative Jolene Sullivan lived in Pompano Beach, Florida. She continues to do so today. At all times material to this litigation, Jolene was a Credit Union member.

4. Defendant IBM Southeast Employees' Federal Credit Union is a federally chartered corporation under 12 U.S.C. § 1461 *et seq.* The Credit Union maintains its headquarters in Boca Raton, Florida, where it was founded, along with seven other branches across Florida. No localized operation, the Credit Union also maintains seven branches in Atlanta, Georgia, as well as one branch in Birmingham, Alabama. All told, these various branches serve over 70,000 members across the country.

## RELEVANT NON-PARTIES

5. Lary B. McCants ("McCants") served as the Credit Union's President and Chief Executive Officer ("CEO") during all times relevant and material to the allegations in this complaint. McCants maintains his office at the Credit Union's headquarters in

2

Boca Raton, Florida, and upon information and belief, McCants is domiciled in the State of Florida.

6.  Barry Hughes ("Hughes") worked in an executive capacity as a Credit Union employee at the Credit Union headquarters in Boca Raton, Florida. At times material to this complaint, and upon information and belief, it is alleged that Hughes is domiciled in the State of Florida.

7.  Cornerstone Ministries Investments ("Cornerstone Ministries") is a Georgia Corporation that filed for bankruptcy in February 2008. Formed in 1996, Cornerstone Ministries issued bonds from 1996 through October 2007, purportedly to fund investments in building churches, retirement homes, and child care centers. Although Cornerstone Ministries filed various registration statements with the United States Securities & Exchange Commission ("S.E.C."), none of Cornerstone Ministries' securities were ever listed or authorized to be listed on any national exchange.

8.  Because of inaccurate statements in its prospectuses, Cornerstone Ministries became the subject of numerous enforcement actions by various state securities commissions, including Maine, Ohio, Indiana, New Jersey, Colorado, and Kansas. In each case, Cornerstone Ministries either settled or lost outright.

9.  Wellstone is a defunct broker-dealer that Cornerstone Ministries created for the main purpose of marketing bonds issued by Cornerstone Ministries. But regulatory restrictions prevented Cornerstone Ministries from distributing its own securities through an affiliated broker-dealer like Wellstone. Rather than abandon the creation of Wellstone, Cornerstone Ministries simply gave Wellstone to the African-American Church Growth Foundation, another entity closely affiliated with Cornerstone

Ministries, largely owned and operated by principals at Cornerstone Ministries or their close associates. To wit, several Cornerstone Ministries employees, directors, and officers worked in senior positions at Wellstone.

**CORNERSTONE MINISTRIES' CLOSE AFFILIATION WITH WELLSTONE**

10. Cornerstone Ministries' history and entanglement with Wellstone is well documented in an Examiner's Report (cited "Report at __") (attached as Exhibit A), prepared and filed in Cornerstone Ministries' bankruptcy by Pat Huddleston, Esq. ("Examiner"). The Examiner concluded that the facts "paint[ed] a troubling picture of broker misconduct." (Report at 28). Further, citing Exchange Act § 10(b) and Exchange Act Rule 10b-5, the Examiner concluded that "Cornerstone Ministries bondholders may be able to recover [against Wellstone and its registered representatives] for . . . fraud." (Report at 29).

11. Referring specifically to Wellstone, the Examiner said the situation was "particularly troubling." (Report at 30). Eventually, Wellstone withdrew its registration as a broker-dealer in December 2007.

12. Wellstone was the chief market-maker for Cornerstone Ministries bonds. As it turns out, both Wellstone and Cornerstone Ministries, which were affiliates of one another, flouted the law -- all to the great detriment of bond buyers like Plaintiffs and the Class members.

13. Eventually, Cornerstone Ministries collapsed under the weight of practices that would spawn an inquiry by the Georgia Securities Commission.

14. The bottom line is that Cornerstone Ministries created Wellstone to sell Cornerstone Ministries' bonds, and that Cornerstone Ministries was, in reality, another

gross affinity fraud that, in the name of God, preyed on people's Christian faith, hope, and noble intentions all to bilk investors.

## JURISDICTION

15.     This Court possesses subject-matter jurisdiction over this matter based upon 28 U.S.C. § 1332(d)(2).

## VENUE

16.     Venue is proper in this district because much, if not all, of the wrongs alleged herein occurred in Palm Beach County, Florida. Additionally, several named parties either reside in this district (as is the case with Plaintiffs), or maintain their headquarters in this district (as does the Credit Union).

## FACTUAL ALLEGATIONS—WHAT HAPPENED

17.     Plaintiffs and the Class hereby disclaim any and all inferences or allegations that the Credit Union acted with any intent to defraud or otherwise to do harm to Plaintiff and the Class; rather, Plaintiff and the Class allege that the Credit Union acted negligently.

18.     The Credit Union's first negligent act in this debacle was to invite, with little or no due diligence, the proverbial fox, (*i.e.*, Wellstone), into the henhouse, (*i.e.*, the Credit Union). To that end, the Credit Union gave Wellstone representatives and their assistants' office space within Credit Union facilities. The Credit Union placed signs for Wellstone in its lobbies. And generally speaking, the Credit Union gave Wellstone all the indicia of a safe, reliable option for financial services. But it was not long before the fox was feasting on hapless chickens, (*i.e.*, Credit Union members).

19.   The Credit Union's second negligent act in this debacle was negligently omitting to disclose that Wellstone was a bucket shop rife with fraud and so closely related to Cornerstone Ministries that both were one in the same.  The Credit Union should have discovered and disclosed these facts before the Credit Union opted to hold out Wellstone to Credit Union members as a sound option for financial services.

20.   The Credit Union not only failed to conduct adequate due diligence as to Wellstone and failed to disclose that Wellstone was rife with fraud, but also the Credit Union affirmatively promoted Wellstone as a safe and reliable option for financial services for Credit Union members.

21.   For example, the Credit Union sent out newsletters to Credit Union members like Plaintiffs and the Class (McCants and Hughes controlled the content of these newsletters.) which touted Wellstone and coaxed Credit Union members with the following recommendations:

> When it comes to <u>financial services</u>, every institution has a different outlook. At IBM Southeast EFCU, our goal is to look out for your future. We help you keep pace with changing realities, set targets to achieve your goals, and cope with changing financial needs and responsibilities. Independent Financial Services Representatives are ready to share their wealth of experience - and are specially trained to answer your questions with valuable information that can improve your financial well-being.
> Buying a home? Paying medical or education bills? Planning for retirement? Looking for investment opportunities*? Contact a Financial Services Representative today.
>
> 
>
> **In Boca Raton**, call: Christi Seay, 561.982.4700, ext. 4772
> **In Tampa, call**: Barbara Leschander, 727.848.2219
> **In Atlanta, call**: Jay Jones, 678.797.6303
> **In all other areas, call**: 800.873.5100, ext. 4772
>
> *Auto Acquisition Car Finder service provided by Alliance Leasing Corporation.
> ***Securities offered through Wellstone Securities, LLC,** Member NASD/SIPC. Investment products offered are not FDIC, NCUA or NCUSIF insured. Investment products are not obligations of or guaranteed by IBM Southeast EFCU, involve investment risk including the possible loss of principal, and may lose value.

Credit Union Newsletter, Summer 2003 (http://ww.ibmsecu.org/htm/News.BN0603.asp) (downloaded Jun. 12, 2009) (Emphasis added).

22.     Defendant also vetted and designated the investment products Wellstone could offer and sell to Credit Union members and, to that end, produced and distributed to Wellstone representatives at Credit Union offices a list of Credit-Union approved investment products—and Cornerstone Ministries bonds were on that list.

23.     After Cornerstone Ministries collapsed, the Credit Union tacitly admitted that the Credit Union should have performed due diligence as to Wellstone before it provided Wellstone with unique and unfettered access to Credit Union members to offer and sell to those members bonds issued by Cornerstone Ministries. Indeed, after the Credit Union had ejected Wellstone from its premises, McCants wrote a letter, attached hereto as Exhibit B, to Plaintiffs and to all Class members, saying that a new broker-dealer would replace Wellstone, and that this time, the Credit Union had conducted ample due diligence to ensure the Wellstone debacle was not repeated.

24.     To add further insult to injury, the facts already known to Plaintiffs and the Class demonstrate that while the Credit Union's negligence caused its members to suffer greatly, the Credit Union itself actually profited. Indeed, Plaintiffs and the Class actually earned myriad fees for, in essence, what turned out to be its negligently having exposed its members to harm *vis-à-vis* Wellstone (and Cornerstone Ministries). Moreover, the amount of the fees earned by the Credit Union was directly proportional to the amount of product sold by Wellstone (including the sale of bonds in Cornerstone Ministries). As such, it should come as no surprise that the Credit Union constantly pressured Wellstone representatives to spend more time at the Credit Union's offices so

as to increase the amount of sales to Plaintiffs and all members of the Class and, hence, the amount of fees for the Credit Union. The bottom line is that the Credit Union profited while Plaintiffs and the Class suffered.

25. And the Credit Union's interest in maximizing its own fees (unwittingly at the expense of the Class) did not stop with its pushing Wellstone to sell more product to Plaintiffs and the Class (including Cornerstone Ministries bonds). Rather, the Credit Union (particularly Messrs. McCants and Hughes) also exercised control over the hiring and firing of Wellstone representatives who were to operate within the confines of the Credit Union. And if a Wellstone representative were not generating enough fees for the Credit Union (from the perspective of the Credit Union), then the Credit Union would pressure that representative to sell more product (including bonds in Cornerstone Ministries) so as to generate more fees for the Credit Union – or that representative would be fired.

26. The bottom line is that the Credit Union earned substantial fees in exchange for its negligently having exposed Credit Union members to harm vis-à-vis Wellstone and Cornerstone Ministries. Again, the Credit Union negligently failed to (i) conduct adequate due diligence on Wellstone, and (ii) disclose that Wellstone was rife with fraud and infected by overly cozy relationships between Wellstone and Cornerstone Ministries executives such that the two were in essence the same. Indeed, even a modicum of due diligence would have revealed that Wellstone was not a sound choice for financial services, and that Cornerstone Ministries, in particular, was not safe. For example:

    a. Cornerstone Ministries said in an SEC registration statement that its common stock was approved for listing on the Chicago Stock Exchange under the symbol IHN; that was incorrect. Cornerstone Ministries securities were neither listed, nor approved for listing, on the Chicago Exchange;

    b. Regulators from Maine, Michigan, Minnesota, and Texas brought actions against Cornerstone Ministries for lying about Cornerstone Ministries stock being listed, *see* Exhibit C (Texas Securities regulators' action against Cornerstone Ministries);

    c. According to a "Stop Order" issued by the State of New Jersey's Bureau of Securities, "Cornerstone Ministries engaged in dishonest and unethical practices in the securities business," *see* Exhibit D at ¶ 16 (New Jersey Bureau of Securities Order) (Oct. 5, 2005);

    d. Wellstone was a broker-dealer affiliated with Cornerstone Ministries, and Cornerstone Ministries had recruited Wehmiller to launch Wellstone as Cornerstone Ministries exclusive broker-dealer, even though applicable regulations forbid such activities;

    e. In an attempt to avoid those forbidding and applicable regulations, Cornerstone Ministries ordered Wehmiller to give Wellstone to a non-profit the African-American Church Growth Foundation, Inc.—another related entity, such that the purported separation between Cornerstone and Wellstone was optic only; and

    f. Wellstone's liability policy specifically *excluded* securities offered by Cornerstone Ministries.

27. Additionally, other factors militated that the Credit Union undertake some modicum of due diligence before allowing Wellstone access to Credit Union clients, recommending Wellstone to Credit Union clients, or actively referring Credit Union clients to Wellstone:

    a. Both Wellstone and Cornerstone Ministries were obscure actors in the securities markets;

    b. Cornerstone Ministries securities were likewise obscure, as well as unregistered and ill-liquid.

9

28. But rather than undertake appropriate due diligence that would have revealed all of the foregoing, the Credit Union negligently omitted to investigate, discover, and disclose any of the foregoing.

29. Rather, the Credit Union and its agents, employees, and officers, spoke positively about Wellstone and Cornerstone Ministries, touting Cornerstone Ministries' philanthropic mission to fund the construction of churches for the faithful and assisted living facilities for the aged. They omitted any mention of easily ascertainable and very material information that Wellstone and its creator and benefactor, Cornerstone Ministries, were entities to beware of—entities that should have been thoroughly investigated before any referral, recommendation, or investment. *See* Exhibit __ .[1]

30. The bottom line is that the Credit Union was negligent. And by virtue of the Credit Union's negligence:

    a. On July 30, 2004, Claudia paid fifty thousand dollars ($50,000) for a Cornerstone Ministries bond. Shortly thereafter, on January 25, 2005, Claudia trustingly invested another ten thousand dollars ($10,000) to purchase another Cornerstone Ministries bond, through Wellstone representative Dell Miller in Orlando. (The Credit Union directed Claudia to Dell Miller.);

    b. On November 27, 2006, Jolene paid $58,873.45 for a Cornerstone Ministries bond sold through Wellstone at the Credit Union's offices; and

    c. In July 2007, Ursula purchased $100,000 in Cornerstone Ministries bonds, sold through Wellstone at the Credit Union's offices on March 21, 2005 ($50,000); December 6, 2006 ($25,000); and July 10, 2007 ($25,000).

31. Neither Plaintiffs nor any Class member has received any interest on the bonds since January 2008.

---

[1] Additionally, just about every broker-dealer or investment advisor who sold Cornerstone Ministries securities had a history of regulatory violation—yet another fact that the Credit Union negligently failed to discover or to disclose.

## COUNT ONE--NEGLIGENCE

32.     Plaintiffs here incorporate by reference paragraphs one through thirty-one, as if fully here re-alleged.

33.     The Credit Union bore a duty to its customers, which included Plaintiffs and the Class, to ensure that the Credit Union did not invite within its premises an unsuitable broker-dealer.

34.     To satisfy that duty, the Credit Union should have performed adequate due diligence on Wellstone. But the Credit Union did not. Instead, the Credit Union simply accepted that Wellstone was a reputable and trustworthy broker-dealer—when it plainly was not.

35.     The Credit Union's failure to perform due diligence led to the Credit Union's omitting to disclose material and adverse information about Wellstone and Cornerstone Ministries. The Credit Union's failure here made the harm suffered by Plaintiffs and the Class reasonably foreseeable. The Credit Union, in short, created a zone of risk.

36.     But for the Credit Union's universal and class-wide omission to disclose material and adverse facts, including, inter alia, those facts set forth in paragraphs 26 and 27, no Plaintiff nor class member would have purchased any securities from Wellstone.

37.     The Credit Union's negligence here is also the proximate cause of Plaintiffs' and the Class's damages.

38.     Plaintiffs in the Class suffered millions of dollars in damages.

## CLASS ALLEGATIONS

39. Plaintiffs and the Class seek class certification under Rule 23 of the Federal Rules of Civil Procedure, and to that end make the following allegations regarding class action status and certification:

   a. Plaintiff brings this putative class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure;

   b. Plaintiff does so on behalf of all Credit Union members who acquired Cornerstone Ministries securities beginning on July 30, 2004 through September 5, 2008; and that the Class period runs from at least July 30, 2004 through September 5, 2008;

   c. Excluded from the Class are all the defendants, the Credit Union, its officers and directors, their legal representatives, heirs, and assigns, as well as any entity in which any of the foregoing had or has a controlling interest;

   d. The members of the Class are so numerous that joinder of all Class members is impracticable—Plaintiffs believe that the Class members number in the hundreds;

   e. Plaintiff's claims are typical of that of the Class;

   f. Plaintiff will fairly and adequately protect the Class' interests and has retained counsel experienced and competent in the prosecution of class actions involving violations of the Georgia and federal securities laws;

   g. A class action is superior to all other methods of resolution; and

   h. Question of law and fact predominate over any questions solely affecting individual Class members; those common questions include:

      1. Whether the Credit Union negligently omitted to discover and/or disclose to its members material, adverse information about Wellstone and Cornerstone Ministries; and

      2. Whether, and to what extent, the Class has suffered damages from the violations alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this is a proper class action and certifying it as such, along with appointing Plaintiffs as class representatives;

B. Determining that Defendant perpetrated the wrongs identified in this complaint, and that those wrongs damaged Plaintiffs and the Class;

C. Awarding compensatory damages in Plaintiffs' and the Class's favor, including pre-judgment interest, costs, and expert fees, and attorney's fees, at an amount to be determined in a jury trial; and

D. Such equitable and injunctive relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all issues so triable.

Dated: October 27, 2009.

By: /s/ Scott L. Silver
SCOTT L. SILVER
Fla. Bar No. 095631
silver@stockattorneys.com

BLUM & SILVER, LLP
Attorneys for Plaintiff
12540 W. Atlantic Blvd.
Coral Springs, FL 33071
Telephone: (954) 255-8181
Facsimile: (954) 255-8175

JAMES D. SALLAH
Fla. Bar No. 92584
JOSHUA A. KATZ
Fla. Bar No. 848301
SALLAH & COX, LLC
2101 N.W. Corporate Blvd., Suite 218
Boca Raton, FL 33431
Telephone: (561) 989-9080
Facsimile: (561) 989-9020

SCOTT DIMOND
Fla. Bar No. 995762
sdimond@dkrpa.com
JEFFREY KAPLAN
Fla. Bar No. 39977
jkaplan@dkrpa.com
DAVID ROTHSTEIN
Fla. Bar No. 0056881
drothstein@dkrpa.com
DIMOND KAPLAN & ROTHSTEIN, P.A.
Offices at Grand Bay Plaza
2665 South Bayshore Drive, Penthouse 2B
Miami, Florida 33133
Telephone (305) 374-1920
Facsimile: (305) 374-1961

## ATTORNEY'S CERTIFICATION AS TO SERVICE

I HEREBY CERTIFY that the foregoing document was filed using the Court's CM/ECF system and was served this 27th day of October 2009, upon counsel via the CM/ECF system.


/s/ Scott L. Silver
Scott L. Silver